Filed 8/30/23 (unmodified opn. attached)

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| INFINITY SELECT INSURANCE CO. et al., <br><br> Petitioners, <br><br> v. <br><br> THE SUPERIOR COURT OF FRESNO COUNTY, <br><br> Respondent; <br><br> CAL LEDUC et al., <br><br> Real Parties in Interest. | F085014 <br><br> (Super. Ct. No. 19CECG01278 ) <br><br><br> **ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGEMENT]** |

**THE COURT:**

It is so ordered that the partially published opinion filed on August 8, 2023, be modified as follows:

1.    After headings I., II., VI., VII., and VIII. of the Discussion add the following unnumbered footnote:

\*       See footnote, *ante,* page 1.

2.     At the end of the first full paragraph on page 7, after the sentence ending in "box was checked," add as footnote 7 the following footnote, which will require renumbering of all subsequent footnotes:

> **7**     In its writ petition, Infinity alleged "Guerra's application *did not* ask Infinity to file a Form 65 certificate of insurance with the DMV …. In fact, in response to the application's inquiry whether any DMV filing was necessary, the 'No' box was checked." Relevant to that allegation, plaintiffs responded, "Admit the broker/producer probably supplied the answer to Infinity's question 'State Filing' 'yes' or 'no' without understanding 'no' meant Infinity would be violating the law." We deem the allegation admitted. (*Bank of America, N.A. v. Superior Court* (2013) 212 Cal.App.4th 1076, 1101 [when a party fails to deny a verified allegation, it is deemed admitted].) For the sake of precision, the referenced question and answer on the application form read, "DMV/PUC Filing ___ Yes _X_ No".
>
> In their writ return, plaintiffs denied that Guerra, himself, completed the application form.

3.     On page 11, the second sentence of the paragraph under heading III. of the Discussion beginning "The undisputed facts," the words "that" are replaced with "whether," so the sentence now reads:

> The undisputed facts, as presented to us, do *not* indicate whether Guerra ever requested insurance in order to comply with the MCPPA, or whether he requested Infinity file a DMV Form 65 certificate of insurance or issue a DMV Form 67 policy endorsement.

4.     On page 11, the last sentence of the paragraph under heading III. of the Discussion beginning "Rather, Infinity issued," is deleted and replaced with the following sentence:

> In short, this is not a case premised on alleged unmet expectations of Guerra or alleged misrepresentations by Infinity.

2.

5.	On page 12, the first sentence of the second paragraph beginning "To obtain a valid motor," is deleted and replaced with the following sentence:

> To receive a valid motor carrier permit, a motor carrier of property must, among other things, obtain "[e]vidence of financial responsibility."

There is no change in the judgment.

Real parties in interests petition for rehearing filed on August 24, 2023, is denied.

FRANSON, J.

WE CONCUR:


LEVY, Acting P. J.


SMITH, J.

Filed 8/8/23 (unmodified opinion)

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| INFINITY SELECT INSURANCE COMPANY et al.,<br><br>    Petitioners,<br><br>    v.<br><br>THE SUPERIOR COURT OF FRESNO COUNTY,<br><br>    Respondent;<br><br>CAL LEDUC et al.,<br><br>    Real Parties in Interest. | F085014<br><br>(Super. Ct. No. 19CECG01278 )<br><br>**OPINION** |

ORIGINAL PROCEEDINGS; petition for writ of mandate.  D. Tyler Tharpe, Judge.

Sheppard, Mullin, Richter & Hampton, Peter H. Klee, Thomas R. Proctor and Todd E. Lundell for Petitioner.

No appearance for Respondent.

Cornwell & Sample, Stephen R. Cornwell; Freedman Law and Vernon J. Reynolds for Real Parties in Interest.

-ooOoo-

---

[*]    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I., II., VI., VII., and VIII. of the Discussion.

## INTRODUCTION

Petitioners Infinity Select Insurance Company and Infinity Property and Casualty Corporation (collectively, Infinity) are named defendants in a pending action (*Cal LeDuc et al. v. Infinity Select Insurance Company et al.* (Super. Ct. Fresno County, 2019, No. 19CECG01278) (the instant lawsuit).)

The instant lawsuit stems from an earlier 2013 case (the prior action) in which plaintiffs, named here the real parties in interest, sued Infinity's insured, Mario Guerra and his employee Daniel Canchola, for negligence and wrongful death in connection with a three-vehicle collision (the collision) involving Canchola, two of the plaintiffs, and others.[1] At the time of the collision, Guerra and Canchola were insured/protected from liability under a policy issued by Infinity with a bodily injury policy limit of $50,000 per accident. Plaintiffs contend it was unlawful for Infinity to issue a policy with such a low limit because Guerra, as a motor carrier of property, was required to have a minimum of $750,000 in coverage. Plaintiffs submitted an assumed policy limits settlement demand of $750,000 to settle the entire action, which was rejected.

The prior action eventually settled in October 2017. Under the terms of the settlement, plaintiffs and Infinity agreed that (1) plaintiffs' overall damages total $3,565,995.23; (2) plaintiffs would dismiss the prior action; (3) plaintiffs would be assigned Guerra and Canchola's claims against Infinity for bad faith failure to settle; and (4) plaintiffs could pursue their legal claims against Infinity to establish Infinity's liability for damages in excess of its stated policy limits without having to secure a judgment against Guerra and Canchola. The instant lawsuit followed.

In the first phase of a bifurcated trial, the trial court adjudicated the first two causes of action of plaintiffs' eight causes of action against Infinity: (1) breach of the insurance contract under Insurance Code section 11580, subdivision (b)(2), where plaintiffs, as

---

[1]    (*Cal LeDuc et al. v. General Motors LLC, et al.* (Super. Ct. Fresno County, 2013, No. 13CECG03811).)

judgment creditors, were seeking judgment of $750,000 against Infinity and (2) declaratory relief that the policy limits are $750,000.  In August 2022, the court issued its ruling.  The primary effect of the ruling was to reform the Infinity policy to provide greater bodily injury policy limits of $750,000.  Per its terms, the ruling "establishes the policy limits for the jury's consideration in the upcoming jury trial on the remaining causes of action" including plaintiffs' cause of action against Infinity for bad faith breach of the implied covenant of good faith and fair dealing due to Infinity's rejection of plaintiffs' Code of Civil Procedure section 998 demand of $750,000.

Infinity filed a petition for a writ of mandate challenging the subject ruling.  We granted an alternative writ and stayed the proceedings below.

We conclude the trial court erred in reforming the Infinity policy and will issue a peremptory writ.

### FACTUAL AND PROCEDURAL BACKGROUND

*The Infinity Policy*

Infinity Select issued the Infinity policy to Guerra for the policy period June 3, 2013, to June 3, 2014.[2]  The declarations page of the policy identified the following vehicles as insured: a 2000 Ford Econoline E250; a 2005 Ford F150; and a 2001 Dodge RAM 3500 (the RAM truck).  It identified the limits of liability for bodily injury at $25,000 for each person and $50,000 for each accident and for property damage at $15,000 for each accident (together, "minimum auto liability coverage").

*The Collision and Prior Action*

On June 12, 2013, Guerra's employee, Canchola, while driving the RAM truck with Guerra's permission collided with two other vehicles.  A passenger in one of the vehicles, Marsha LeDuc (decedent), was fatally injured.  Her daughter and granddaughter were also

---

[2]     Although not relevant to the issues before us, it appears from stipulations by the parties that the Infinity policy may have been in effect only through January 21, 2014.

in the vehicle and suffered injuries. The third vehicle was driven by Guadalupe Medina. Ms. Medina is not a party to the instant lawsuit.

Plaintiffs include decedent's daughter, granddaughter, and other heirs. They filed the prior action against Guerra, Canchola, and others in December 2013. While the action was pending, plaintiffs served a Code of Civil Procedure section 998 policy limits demand to settle all outstanding claims against Guerra and Canchola for $750,000—the amount plaintiffs contend was the minimum required policy limit. The offer was not accepted.

Plaintiffs contend (and Infinity disputes) (1) California law required Guerra to have insurance with minimum limits of liability of $750,000 by virtue of the fact his RAM truck was a commercial vehicle; (2) all applicable state law requirements for commercial auto liability coverage, including state law requirements for the amounts of liability coverage, are read into the Infinity Policy; and (3) the Infinity Policy provisions provide the policy will conform to the state law requirements for the amounts of liability coverage and, as a result, the actual limits of liability are or should be a total of $750,000 for all injuries and deaths. Plaintiffs rely on provisions of the Motor Carriers of Property Permit Act (MCPPA) (Veh. Code, § 34600 et seq.)[3] to support their claim Infinity was required to issue an insurance policy with minimum liability coverage of $750,000.

Shortly after trial in the prior action began, the case settled. Plaintiffs and Infinity stipulated that Guerra and Canchola were negligent; that Canchola was acting in the course and scope of his employment for Guerra while driving the RAM truck; and that Guerra and Canchola's negligence was the cause of decedent's death and the injuries to her daughter and granddaughter.

*Covenants in the Prior Action Settlement Agreement*

Under the terms of the prior action settlement agreement, plaintiffs agreed to dismiss the prior action with prejudice "after the court in the [prior action] has ruled on the amount

---

[3]    All statutory references are to the Vehicle Code unless otherwise noted.

4.

of costs to which the Plaintiffs are entitled which amount … shall be added to the agreed-to damages set forth below."  As to "agreed-to damages," the settlement agreement provided, in relevant part:

> "3.    Plaintiffs contend that the Infinity Policy has or should have operative $750,000 limits of liability imposed by law and/or the provisions of the policy and that Infinity would be, at minimum, liable up to those $750,000 limits of liability in connection with an entry of judgment in Plaintiffs' favor in the [prior action].  Infinity agrees that if Plaintiffs prevail on this contention, then Plaintiffs will be entitled to recover the sum of $750,000 from Infinity as damages in the [instant lawsuit].  This provision shall not otherwise limit the damages to which the plaintiff may otherwise be entitled.

> "4.    Additionally, Plaintiffs contend that they made a reasonable offer to settle the [prior action] for an amount within the Infinity Policy's claimed $750,000 limits of liability imposed by law and/or the provisions of the policy, and that Infinity unreasonably rejected that offer.  Infinity agrees that if Plaintiffs can prove this 'bad faith failure to settle' claim in the [instant lawsuit], Plaintiffs may recover from Infinity the full amount of the agreed upon damages and costs set forth in affirmative covenant number 5 below.

> "5.    The Parties agree and stipulate that, for purposes of determining the potentially recoverable damages in the [instant lawsuit], the amount of damages which the jury would have found and which would have been reduced to judgment in the [prior action] are:

> "(i)    damages for the wrongful death claim arising out of the death of [decedent], which the parties agree has a value of $2,562,941.28;

> "(ii)    damages for [decedent's daughter's] injury claim, which the parties agree has a value of $79,677.52;

> "(iii)   damages for [decedent's granddaughter's] injury claim, which the parties agree has a value of $136,079.64; and

"(iv) Plaintiffs' recoverable costs of suit in the [prior action] ...."[4]

Plaintiffs obtained an award of costs in the prior action in the amount of $836,326.79.

*Additional Stipulated and Admitted Facts*

The first phase of trial in the instant lawsuit was a bench trial on the first two causes of action. In advance of the trial date, the parties stipulated, among other things, (1) the gross vehicle weight rating (GVWR) for the RAM truck was 10,001 to 14,000 pounds; (2) based on the GVWR of the RAM truck and "the manner in which it was being used during the term of the [Infinity] policy, ... Guerra was a 'motor carrier of property,' as defined by ... section 34601"; (3) "Infinity did not issue a policy endorsement using [Department of Motor Vehicles (DMV)] form 67 MCP [hereafter, DMV Form 67 policy endorsement] upon issuance of the policy in either May 2012 or June 2013" (in essence, this endorsement incorporates provisions of the MCPPA into an insurance policy); (4) "Infinity did not issue a DMV form 65 [hereafter, DMV Form 65 certificate of insurance] to the [DMV] prior to the [collision]" (in essence, an insurer who issues such a certificate, certifies the insurance policy is being issued in compliance with the MCPPA); (5) the RAM truck was an " 'insured auto' " as defined in the policies; (6) "plaintiffs have an assumed judgment of $3,615,005.23 plus interest from the date of the dismissal of the [prior] action"[5]; and

---

**4** In addition, Infinity agreed the "amounts set forth in [paragraph] 5 above may be presented to the jury in the [instant lawsuit] as the amount of a 'judgment' entered in the [prior action]" and that [Infinity] would not "assert any defense in the [instant lawsuit] based on: (1) the fact that no verdict was rendered by the jury and/or no final judgment was entered in the [prior action] ...; (2) the fact that Plaintiffs do not have an operative assignment from Guerra and/or Canchola of their respective rights under the [subject] Infinity Policy ...; and (3) any argument that the bankruptcy of Guerra and/or Canchola precludes any of the relief Plaintiffs may seek from Infinity." (According to allegations contained in plaintiffs' original complaint, Guerra and Canchola both declared bankruptcy at some point prior to trial.)

**5** The parties have not explained how the amount of the assumed judgment was calculated. The amount is very close to the sum of the agreed-to damages set forth in paragraph five of the prior action settlement agreement plus the cost award issued by the trial court.

(7) Infinity Select paid plaintiffs the $50,000 policy limit of the Infinity policy to be applied as a credit against a larger judgment, if any, obtained in the instant lawsuit. [6]

The following additional facts were among those admitted by plaintiffs in their return by verified answer to the writ petition: (1) Guerra applied for insurance from Infinity through his broker; (2) Guerra, through his broker, applied for minimum auto liability coverage; (3) Guerra's application for insurance contained checkboxes to indicate whether a DMV filing was necessary. The "No" box was checked.

*Issues Decided by the Trial Court in the First Phase of Trial*

The first phase of trial lasted two days. After the presentation of evidence, the parties executed a stipulation on the issues they wanted the trial court to decide. On August 3, 2022, the trial court issued the subject ruling and resolved the parties' requested issues in the following manner. (The court's response to issues presented by the parties is in bold and underlined type below.)

(1)     "Is an insurance company that issues a policy to a motor carrier of property, as defined by the [MCPPA], required to issue a policy with limits of at least $750,000? **<u>Yes</u>**."

(2)     "Were the limits of the subject Infinity policy amended by law and/or express policy provisions as of the date of issuance to provide limits of $750,000? **<u>Yes</u>**."

(3)     "Upon issuing a policy insuring a motor carrier of property, was Infinity required under California Code of Regulations title 13, section 220.06, to issue a [DMV Form 65 certificate of insurance] … and issue a DMV [F]orm 67 [policy endorsement] ….? **<u>Yes</u>**, as to both forms."

---

[6]     Plaintiffs state that Infinity issued a DMV Form 65 certificate of insurance to the DMV in October 2013, several months after the collision occurred. Although plaintiffs make several references to this fact, they do not adequately explain the relevance of this post-collision insurance and certification to Infinity's obligations at the time it issued the Infinity policy. Moreover, we are unable to discern the relevance of this fact.

7.

(4) "Are the … plaintiffs, as judgment creditors pursuant to Insurance Code section 11580, subdivision (b)(2), entitled to judgment for $750,000, less credits to which Infinity is entitled, plus costs recovered in the underlying case as well as interest pursuant to the Settlement Agreement as of the date of the dismissal of the underlying action in an amount to be determined?  **Yes**."

(5) "Are the provisions of the MCPPA read into an insurance policy that was issued to a motor carrier of property, as defined by Vehicle Code section 34601, where (i) the insurance company did not file a DMV [Form] 65 certificate of insurance with the DMV or otherwise certify to the DMV that the policy complies with the MCPPA and (ii) the insurance policy was issued for less than $750,000?  **Yes**."

(6) "Where an insurance policy has been issued to a motor carrier of property, but the insurance company has not filed a DMV [Form] 65 … certificate of insurance, or otherwise certified that its insurance policy complies with the MCPPA, is the insurance policy governed by the MCPPA or Vehicle Code section 16450 and Insurance Code section 11580.05?  **Such a policy is governed by Vehicle Code section 16450 and Insurance Code section 11580.05 subject to additional requirements imposed by the MCPPA**." (Boldface and underlining added.)

(7) "Under the terms of the October 2017 settlement agreement, are the … plaintiffs entitled to recover under the first cause of action as Insurance Code section 11580 judgment creditors?  **Yes**.

"If so, under what legal theory are they entitled to recover as judgment creditors?  **The theories alleged in the first and second causes of action of the Second Amended Complaint**.

"If so, what damages are they entitled to recover?  **$700,000 plus costs awarded in the underlying case and awardable in this case, plus accumulated interest in an amount to be determined, plus possible attorney fees in an amount**

8.

**to be determined. The Settlement Agreement (Exh. 208) does not limit damages as Infinity contends**.

"**The bench trial resolves the issue of recovery as to the limits of the Infinity policy for purposes of both the declaratory relief and the entitlement to a creditor's claim under Insurance Code section 11580, subdivision (b)(2). It also establishes the policy limits for the jury's consideration in the upcoming jury trial on the remaining causes of action**." (Boldface and underlining added.)

*The Writ Petition and Return by Verified Answer*

On September 29, 2022, Infinity timely filed the writ petition. Infinity requests this court direct respondent trial court to vacate the subject ruling and "enter a new order declaring the Infinity Policy limit is $50,000."

Plaintiffs filed their return. In addition to responding to the allegations of the petition, plaintiffs have alleged three affirmative defenses they contend bar issuance of a writ: the equitable doctrine of laches (on grounds "Infinity could have filed a motion to clarify the scope of the trial court's ruling but failed to do so, and thereby has unreasonably delayed final disposition in this case"); the equitable doctrine of waiver (on grounds "Infinity asked the court to rule on a question of law, received an answer, and now complains about the scope of the question"); and the equitable doctrine of exhaustion (on grounds "Infinity should have asked the trial court to clarify its ruling if it felt the ruling on its question was worded too broadly but failed to do so", citing *Mitchell v. Superior Court* (1984) 37 Cal.3d 268).

## DISCUSSION

I.    PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE

Plaintiffs request this court take judicial notice of the following: "1. California Assembly Bill History, 1995–1996 Regular Session, Assembly Bill 1683, Complete Bill History…. [¶] 2. California Bill Analysis, Senate Floor, 1995–1996 Regular Session,

9.

Assembly Bill 1683…. [¶] 3. Statutes of California and Digests of Measures, 1976, Vol. 3, Chapter 1145, Sec. 5…. [¶] 4. State of California—Department of Insurance, Certificate of Authority Application located at www.insurance.ca.gov/0250-insurers/0300-insurers/0100-applications/certificate-of-authority/cert-of-authority-forms/upload/CDI-015.pdf…."

Infinity objects to plaintiffs' request for judicial notice on the following grounds: (1) the request does not comply with California Rules of Court, rule 8.252(a)(2); and (2) the matter to be judicially noticed is irrelevant. We deferred ruling on plaintiffs' request pending consideration of the petition on its merits.

California Rules of Court, rule 8.252(a)(2) requires a party requesting judicial notice by a court of appeal to state: "(A) Why the matter to be noticed is relevant to the appeal; [¶] (B) Whether the matter to be noticed was presented to the trial court and, if so, whether judicial notice was taken by that court; [¶] (C) if judicial notice of the matter was not taken by the trial court, why the matter is subject to judicial notice under Evidence Code section 451, 452, or 453; and [¶] (D) Whether the matter to be noticed relates to proceedings occurring after the order or judgment that is the subject of the appeal." Plaintiffs' motion does not contain any of the information required by the rule. As a result, we now deny the motion. (See *Kinney v. Overton* (2007) 153 Cal.App.4th 482, 497, fn. 7.)

However, we have reviewed the documents attached to plaintiffs' request and conclude our opinion would be unaffected by the information contained therein.

## II.    STANDARD OF REVIEW

The parties agree the petition presents a "question of law, requiring interpretation of the MCPPA and application of that statutory scheme to the undisputed facts" and that the subject ruling should be reviewed de novo. We also agree. (*Le Gault v. Erickson* (1999) 70 Cal.App.4th 369, 372 [" 'It is well settled that the interpretation and application of a statutory scheme to an undisputed set of facts is a question of law … which is subject to de novo review on appeal.' "].) In its subject ruling, the trial court wrote, "[p]laintiffs have

cited many disputed facts in advancing their arguments on these issues (e.g. Guerra's application actions). The court has not relied on those disputed facts in making these rulings." Thus, it appears the court ruled solely on the basis of undisputed facts before it.

III.    PREFATORY COMMENTS

Because this case is presented to us as one based on undisputed facts, it is perhaps helpful to state what this case (as presented to us) is not about. The undisputed facts, as presented to us, do *not* indicate that Guerra ever requested insurance in order to comply with the MCPPA, or that he requested Infinity file a DMV Form 65 certificate of insurance or issue a DMV Form 67 policy endorsement. Similarly, the undisputed evidence before us does not suggest Infinity ever represented to Guerra that the Infinity policy would comply with MCPPA requirements, or that Infinity would file such certificate of insurance or issue such endorsement. Rather, Infinity issued the type of insurance actually requested in the application Guerra submitted through his broker.

IV.    THE MCPPA AND RELATED DMV REGULATIONS

A motor carrier of property is subject to heightened insurance coverage requirements under the MCPPA. Subject to exceptions not relevant here, former section 34601 of the MCPPA[7] provided, in relevant part, "[a]s used in this division, 'motor carrier of property' means any person who operates any commercial motor vehicle as defined in subdivision (c)." (Former § 34601, subd. (a).) It further provided "[a]s used in this division, except as provided in paragraph (2), a 'commercial motor vehicle' means … any motor truck of two of more axles that is more than 10,000 pounds [GVWR], and any other motor vehicle used to transport property for compensation." (Former § 34601, subd. (c)(1).) As noted above, the parties stipulated Guerra was a "motor carrier of property" by virtue of

---

**7**    Some, but not all, of the relevant statutes discussed in this opinion have been amended since the date of the collision in 2013. Wherever we refer to a "former" version of a statute in the Vehicle Code, it is because that former version was in effect in 2013.

11.

the RAM truck's GVWR and the manner in which he used it during the term of the Infinity policy.

Except in certain situations not relevant here, a motor carrier of property "shall not operate a commercial motor vehicle on any public highway in this state" unless it has complied with certain statutory requirements including the holding of a "valid motor carrier permit" issued by the DMV.  (Former § 34620, subd. (a).)

To obtain a valid motor carrier permit, a motor carrier of property must, among other things, provide the DMV with "[e]vidence of financial responsibility."  (Former § 34621, subd. (b)(6).)  Proof of financial responsibility may take the form of a compliant certificate of insurance, surety bond, or certificate of self-insurance deposited with the DMV.[8] (§ 34631, subds. (a)–(c).)  "A motor carrier permit shall not be granted" until a certificate of insurance meeting the "minimum insurance requirements contained in Section 34631.5" is filed with the DMV.  (§ 34630, subd. (a).)

Section 34631.5 provides, in relevant part:

"(a)(1) Every motor carrier of property as defined in Section 34601, except those subject to paragraph (2), (3), or (4)[9], shall provide and thereafter continue in effect adequate protection against liability imposed by law upon those carriers for the payment of damages in the amount of a combined single limit of not less than seven hundred fifty thousand dollars ($750,000) on account of bodily injuries to, or death of, one or more persons, or damage to or destruction of, property other than property being transported by the carrier for any shipper or consignee whether the property of one or more than one claimant in any one accident."  (§ 34631.5, subd. (a)(1).)

---

[8]     Qualifying nonprofit organizations may also prove financial responsibility by submitting a form indicating "coverage is provided by a charitable risk pool operating under Section 5005.1 of the Corporations Code."  (§ 34631, subd. (d).)

[9]     Paragraphs (2), (3) and (4) of subdivision (a) of section 34631.5 provide different mandatory minimum limits of liability coverage depending on, for example, the type of material being transported.

A motor carrier of property who operates a commercial motor vehicle in violation of insurance permitting requirements is subject to having his or her permit suspended (assuming one has been obtained) (§§ 34631.5, subd. (b)(5), 34632, subd. (b)), cessation of operations (§ 34631.5, subd. (b)(7)), and misdemeanor fines and/or imprisonment (§§ 34660, subd. (a), 34661). Other violations of the MCPPA may result in additional sanctions against a motor carrier of property including issuance of an injunction to prohibit the carrier's continued operation (§ 34660, subd. (c)) and impoundment of the carrier's vehicle(s) (*id*. at subd. (d)).

DMV regulations[10] provide three methods by which a motor carrier of property may prove the financial responsibility necessary to obtain a motor carrier permit: (1) a DMV Form 65 certificate of insurance pursuant to subdivision (a) of section 34631; (2) a surety bond pursuant to subdivision (b) of section 34631; or (3) a certificate of self-insurance pursuant to subdivision (c) of section 34631. (Cal. Code Regs., tit. 13, § 220.06, subd. (a).) These regulations further provide that the DMV Form 65 certificate of insurance "shall be submitted to the [DMV] by the motor carrier's insurance provider" (*id*., at subd. (a)(1)); and "[p]roof of financial responsibility pursuant to … section 16000 et seq., shall not be substituted for the proof required for a Motor Carrier Permit …." (*Id*., at subd. (a)(2).) In addition, DMV regulations provide that a DMV Form 67 policy endorsement "amending the insurance policy to comply with insurance requirements imposed by the [MCPPA] … shall be attached to and made part of, the insurance policy insuring the motor carrier." (Cal. Code Regs., tit. 13, § 220.06, subd. (b).)

The DMV Form 65 certificate of insurance provides, among other things, that the insurer certifies (1) the motor carrier of property has insurance "within the coverage limits

---

[10] The MCPPA authorizes the DMV to "adopt reasonable rules and regulations necessary to administer" the act. (§ 34604.) The DMV is further authorized to "adopt rules and regulations necessary to administer civil sanction proceedings and impose fines for failure to comply with" the act. (*Ibid*.)

identified [in the certificate] as required by … Section 34630, 34631.5 and 34640, and by Part 387 of Title 49 of the Code of Federal Regulations"; (2) the "policy covers all vehicles used in conducting the service performed by the Insured for which a motor carrier permit is required whether or not said vehicle is listed in the insurance policy"; and (3) "[a] fully executed [DMV Form 67 policy] endorsement … is attached to the … policy to conform to the requirements of the [MCPPA] … and the rules and regulations of the DMV."  (DMV Form MC 65 M (rev.12/2012).)  Moreover, a certifying insurer agrees the certificate "shall not be canceled on less than thirty (30) days' notice from the Insurer to the DMV …."  (*Ibid.*)

The DMV Form 67 policy endorsement provides, among other things, that the insurer agrees (1) "[t]o pay, consistent with the minimum insurance coverage required by … Section 34631.5, and consistent with the limits it provides herein, any legal liability of insured for bodily injury, death, or property damage arising out of the operation, maintenance, or use of any vehicle(s) for which a motor carrier permit is required, whether or not such vehicle(s) is described in the attached policy[]; (2) "[n]o provision, stipulation, or limitation contained in the attached policy or any endorsement shall relieve insurer from obligations arising out of [the e]ndorsement or the [MCPPA]"; and (3) the policy "shall not be cancelled on less than thirty (30) days' notice from the Insurer to the DMV."  (DMV Form MC 67 M (rev. 10/2010).)

The parties have not cited to any statute or regulation that expressly or impliedly authorizes a court to reform the coverage limits of the Infinity policy and we have not found any in our review.

V.     UNDER THE UNDISPUTED FACTS AS PRESENTED, AN INSURER THAT ISSUES AN INSURANCE POLICY TO A MOTOR CARRIER OF PROPERTY IS NOT REQUIRED TO PROVIDE COVERAGE IN THE AMOUNT OF $750,000

"Our fundamental task in construing a statute is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.  [Citation.]  We begin by examining

14.

the statutory language, giving the words their usual and ordinary meaning. [Citation.] If there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language governs. [Citations.] If, however, the statutory terms are ambiguous, then we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] In such circumstances, we ' "select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." ' " (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272.)

A. *The Motor Carrier of Property—Not the Insurer—Bears Ultimate Responsibility for Meeting the Requirements Necessary to Obtain a Motor Carrier Permit*

Infinity contends the plain language of the MCPPA demonstrates it imposes obligations on motor carriers but not insurers who have not certified compliance with the MCPPA. In general, we agree.

Former section 34620 prohibits a motor carrier of property from "operat[ing] a commercial motor vehicle on any public highway" unless it has met certain requirements including "hold[ing] a valid motor carrier permit issued … by the [DMV]." (Former § 34620, subd. (a).) "The [DMV] shall issue a motor carrier permit upon the *carrier's written request*, compliance with [among other things] Section[] 34630" and payment of the required fee. (*Ibid*., italics added.) As noted above, section 34630 provides a motor carrier permit "shall not be granted" unless proof of financial responsibility is filed with the DMV. (§ 34630, subd. (a).) Proof of financial responsibility in the form of a certificate of insurance must meet the requirements of section 34631.5. Subject to certain exceptions not applicable here, section 34631.5 provides "*[e]very motor carrier of property* … shall provide and thereafter continue in effect" insurance coverage meeting the $750,000 minimum coverage limits. (§ 34631.5, subd. (a), italics added.)

15.

The MCPPA imposes further obligations on motor carriers of property. (§ 34632 ["Every motor carrier of property shall furnish the [DMV] annually, …, a list, prepared under oath, of all vehicles, described in Section 34601, used in transportation during the preceding year"]; § 34633 ["Every motor carrier of property with a carrier fleet of 20 or more commercial motor vehicles" are subject to additional reporting requirements].)

If the motor carrier's insurance policy is certified, the policy "shall provide coverage with respect to the operation, maintenance, or use of any vehicle for which a permit is required, although the vehicle may not be specifically described in the policy." (§§ 34630, subd. (a), 34631.5, subd. (b)(1).) In addition, "[t]he certificate of insurance shall not be cancelable on less than 30 days' written notice from the insurer to the [DMV] except in the event of cessation of operations as a permitted motor carrier of property[]" (§§ 34630, subd. (b), 34631.5, subd. (b)(3)) and "shall remain in full force and effect until cancelled." (§ 34631.5, subd. (b)(4).) These obligations adhere to an insurer that has certified an insurance policy. The plain language of the statute does not impose any requirements upon an insurer that has not certified an insurance policy.

In interpreting provisions of the Highway Carriers' Act (Pub. Util. Code, former § 3501 et seq.), the statutory scheme that regulated motor carriers of property prior to enactment of the MCPPA, our state Supreme Court noted a commercial highway carrier "bears the ultimate responsibility for maintaining adequate liability coverage." (*Transamerica Ins. Co. v. Tab Transportation, Inc*. (1995) 12 Cal.4th 389, 404 (*Tab*).) Nothing in the text of the above MCPPA provisions operates to transfer such a responsibility to an insurer who has not certified an insurance policy for the purpose of complying with the MCPPA, and who has not included an endorsement incorporating the provisions of the MCPPA into its policy.

Plaintiffs point to California Code of Regulations, title 13, section 220.06, subdivision (a) in support of their contention that Infinity was required to issue a compliant MCPPA policy with liability limits of $750,000. That regulation states acceptable proof of

16.

insurance (i.e., one form of financial responsibility) under the MCPPA "shall be submitted to the department in the form of a [DMV Form 65 certificate of insurance]"; said certificate "shall be submitted to the [DMV] by the motor carrier's insurance provider"; and that "[p]roof of financial responsibility pursuant to … Division 7, … section 16000 et seq., shall not be substituted for the proof required for a Motor Carrier Permit." (Cal. Code Regs., tit. 13, § 220.06, subd. (a)(1), (2).) Moreover, the regulation provides that a DMV Form 67 policy endorsement "amending the insurance policy to comply with insurance requirements imposed by the [MCPPA], commencing with … section 34630, shall be attached to and made part of, the insurance policy insuring the motor carrier." (Cal. Code Regs., tit. 13, § 220.06, subd. (b).)

We read the above regulation as providing that *when an insurer issues a policy with the purpose of meeting the requirements of the MCPPA*, it is required to (1) issue a DMV Form 65 certificate of insurance and to submit the certificate to the DMV; and (2) attach a DMV Form 67 policy endorsement to the policy. Nothing in the regulation suggests that an insurer who does not issue a policy for that purpose is nevertheless required to issue the DMV Form 65 certificate of insurance or include the DMV Form 67 policy endorsement in the policy it issues.

B. *Even Where An Insurer Intends to Issue and Certify a Policy Under Section 34631.5, It Is Not Obligated to Issue the Policy in the Full Amount of $750,000*

Infinity contends a motor carrier of property may meet its MCPPA insurance obligations by purchasing more than one policy so long as the aggregate limits of the policies procured total $750,000. Plaintiffs' counsel conceded this point at oral argument. We too agree.

First, we note section 34630 appears to contemplate that a certificate of insurance may be issued for less than the full $750,000 coverage requirement. It provides, in relevant part, "[a] motor carrier permit shall not be granted … until there is filed with the department proof of financial responsibility in the form of a currently effective certificate of insurance,

… *if* the policy represented by the certificate meets the minimum insurance requirements contained in Section 34631.5." (§ 34630, subd. (a), italics added.) The Legislature's use of the word "if" in subdivision (a) of section 34630 suggests the Legislature contemplated a certified policy *may* or *may not* meet the requirement contained in section 34631.5.[11]

Second, DMV regulations support Infinity's proffered interpretation. The DMV Form 65 certificate of insurance allows an insurer to designate whether the policy issued is primary or excess insurance.[12] It also allows an insurer to denote, by checking the appropriate box, whether primary coverage provided is "*below statutory minimum limits*" or "equal to or exceeding statutory minimum limits." (DMV Form MC 65 M (rev. 12/2012), italics added.) Similarly, for excess coverage, the form allows an insurer to denote, again by checking the appropriate box, whether excess coverage provided is "between primary coverage and statutory minimum limits" or "provided at or above statutory minimum limits."[13] (*Ibid.*) The DMV Form 65 certificate of insurance is expressly incorporated into the DMV regulation. (Cal. Code Regs., tit. 13, § 220.06, subd. (a).)

Thus, even where an insurer provides coverage for the purpose of meeting a motor carrier of property's MCPPA requirements, the insurer is allowed to issue a policy with limits below the statutory requirement of $750,000. It is up to the insured motor carrier of

---

[11]  If the Legislature wanted to mandate that a certified policy be issued for no less than the minimum insurance requirement, it could have crafted legislation to so provide.

[12]  " '*Primary* coverage is insurance coverage whereby, *under the terms of the policy*, liability attaches *immediately* upon the happening of the occurrence that gives rise to liability. [Citation.] Primary insurers generally have the primary duty of defense. [¶] '*Excess* ' or *secondary* coverage is coverage whereby, *under the terms of the policy*, liability attaches only after a predetermined amount of primary coverage has been exhausted." (*Century Surety Co. v. United Pacific Ins. Co.* (2003) 109 Cal.App.4th 1246, 1255.)

[13]  At oral argument, plaintiffs' counsel acknowledged the DMV Form 65 certificate of insurance provides a space for an insurance company to indicate whether the policy being certified contains coverage limits below statutory minimum limits.

property to secure additional insurance or to comply with the permitting requirements in other authorized ways (e.g., a surety bond or certificate of self-insurance).

Consequently, even if we were to accept the premise that an insurer must issue an MCPPA compliant insurance policy to a motor carrier of property under the undisputed facts as presented to us—a premise that we do not adopt—nothing in the MCPPA statutes or DMV regulations support reforming the Infinity policy to provide coverage in the full amount of the $750,000.

C. *Evidence of Insurance Is Not The Only Means of Complying with the MCPPA Financial Responsibility Requirements and Infinity Was Under No Duty to Determine Whether Guerra Had Otherwise Complied With MCPPA Requirements*

Infinity contends the subject ruling "ignores the fact that a motor carrier is not actually required to purchase an insurance policy in that amount." Again, we agree.

As discussed *ante*, a motor carrier of property may comply with the MCPPA in several different ways—e.g., through one or more certificates of insurance, a surety bond, or a certificate of self-insurance. (§ 34631, subds. (a)–(c).) It is worth noting that the undisputed facts do not suggest Infinity knew, at the time it issued the Infinity policy, whether Guerra had otherwise met the requirements for a motor carrier permit through other certificates of insurance, a surety bond, or certificate of self-insurance. However, our decision is not dependent upon Infinity's lack of such knowledge.

Infinity, as an insurance carrier, and not a broker, had no duty to ensure that Guerra met the insurance requirements necessary for a motor carrier permit.[14] In *Gibson v. Government Employees Ins. Co.* (1984) 162 Cal.App.3d 441, this court considered the plaintiffs' claim that its insurer breached its fiduciary duty to plaintiffs by failing to advise

---

[14] " 'An [insurance] agent's primary duty is to represent the insurer in transactions with insurance applicants and policyholders.' [Citation.] 'In contrast, a broker's primary duty is to represent the applicant/insured, and his or her actions are not generally binding on the insurer. "Put quite simply, insurance brokers, with no binding authority, are not agents of insurance companies …." ' " (*Mercury Ins. Co. v. Lara* (2019) 35 Cal.App.5th 82, 88.)

19.

them on the "availability and potential need for 'underinsured motorist' coverage, as well as the inadequacy of plaintiffs' $3,000 medical payments benefit." (*Id*. at p. 443.) Although the plaintiffs had been customers of the insurer for 20 years, this court held that "absent some conduct on the part of the insurer consistent with assuming broader duties, the insurer's fiduciary duties are limited to those *arising out of the insurance contract* …." (*Ibid*., italics added.) The court noted that "an insured person's initial decision to obtain insurance and the corresponding decision of an insurer to offer coverage remain, at the inception of the contract at least, an arm's length transaction to be governed by traditional standards of freedom to contract." (*Id*. at p. 448.)

In *Hess v Transamerica Occidental Life Ins. Co.* (1987) 190 Cal.App.3d 941 (*Hess*), a plaintiff was an applicant for "key person" life insurance and was discovered to have high blood pressure after she underwent a medical exam at the insurer's request. (*Id*. at p. 943.) As a condition of insuring the plaintiff, the insurer required her and her company to pay a $1,000 premium surcharge each quarter. (*Ibid*.) The plaintiff agreed and obtained insurance by paying the higher premiums. (*Ibid*.) Approximately seven years later, the plaintiff successfully petitioned her insurer to drop the premium surcharge. (*Ibid*.) She then sued the insurer for reformation of the contract and to recoup $60,000 in premium surcharges previously paid, under the theory the insurer had a "duty of good faith and fair dealing during the period prior to the inception of the contract" and that it breached the duty by "failing to adequately investigate" the plaintiff's health condition. (*Ibid*.) Relying, in part, on *Gibson*, the *Hess* court reaffirmed the principle that an insurance contract, at its inception, is "an arm's length transaction … governed by traditional standards of freedom to contract." (*Id*. at p. 945.) *Hess* concluded that, absent allegations of fraud or fraudulent inducement, the insurer's precontract conduct could not support a cause of action for bad faith. (*Ibid*.) Infinity cites to numerous cases holding similarly.

Plaintiffs contend *Gibson* is irrelevant because it dealt with a policy of insurance that actually met the minimum policy limits required by law whereas, here, the Infinity policy

did not meet the minimum coverage requirements for a motor carrier permit. In their posttrial brief, plaintiffs explained their position as follows: "Plaintiffs do not contend a pre-contractual duty existed to advise Guerra of the need for MCPPA coverage. Rather, Plaintiffs contend that Infinity, once it issues a policy to [a motor carrier of property], may not write coverage less than the amount required by law." However, as discussed above, motor carriers of property are allowed to stack coverage through multiple policies in order to meet the greater policy limits required for a motor carrier permit.

Plaintiffs further contend *Hess* does not stand for the "proposition that an insurer has no duty to evaluate an applicant's insurance needs, to spontaneously procure a policy with a certain amount of coverage, or … to recommend that the prospective insured buy a certain amount of coverage" and that it is not on point because it "dealt with whether an insurer can require a prospective insured to undergo a medical examination to confirm insurability and concluded in the affirmative." We are not persuaded.

We conclude the principles set forth in *Gibson* and *Hess* are relevant to this case. Absent the existence of a statutory duty on Infinity's part to provide greater coverage to Guerra than he requested, and absent proof of the existence of fraud, fraudulent misrepresentation, or assumption of a greater duty, Infinity had no duty to provide Guerra insurance he did not request or apply for. "It is the insured's responsibility to advise the agent of the insurance he wants, including the limits of the policy to be issued." (*Jones v. Grewe* (1987) 189 Cal.App.3d 950, 956; *Everett v. State Farm General Ins. Co.* (2008) 162 Cal.App.4th 649, 660 ["It is up to the insured to determine whether he or she has sufficient coverage for his or her needs."].)

As mentioned, even where an insurer and insured *intend* that the policy issued be used to apply for a motor carrier permit—*a situation not presented by the undisputed facts in the instant lawsuit*—the insurer may issue a policy with a lower limit (e.g., $50,000) and that policy, together with other policies aggregating to a larger limit (i.e., $750,000), may suffice for permitting purposes. Because we conclude that the MCPPA's required coverage

21.

limits may be met by combining multiple policies, we need not consider whether certain uses of the RAM truck were excepted from the financial responsibility requirements of the MCPPA.

Plaintiffs rely on *Barrera v. State Farm Mut. Automobile Ins. Co.* (1969) 71 Cal.2d 659 (*Barrera*) and *Fireman's Fund American Ins. Co. v. Escobedo* (1978) 80 Cal.App.3d 610 (*Fireman's Fund*) for the proposition that Infinity had a duty to investigate whether Guerra required a motor carrier permit and whether the insurance it was providing Guerra was sufficient to meet permitting requirements. Plaintiffs' reliance is misplaced.

The question before the *Barrera* court was whether an insurer could avoid liability under a policy of insurance if it subsequently discovers that the insured made material misrepresentations in applying for the policy. It concluded that "an automobile liability insurer must undertake a reasonable investigation of the insured's insurability within a reasonable period of time from the acceptance of the application and the issuance of a policy" and that an insurer may not avoid liability on the policy by "indefinitely … postpon[ing] its investigation of insurability until such time as it is financially opportune to do so"—i.e., by waiting until a claim against the policy is made. (*Barrera*, *supra*, 71 Cal.2d at pp. 663, 671.) The court held, "failure of the … insurer reasonably to investigate the insurability of the insured within a reasonable time after issuance of the policy, … , results in the loss of the carrier's right to rescind …." (*Id.* at p. 681.) *Fireman's Fund* cited *Barrera* for the same proposition. (*Fireman's Fund*, *supra*, 80 Cal.App.3d at pp. 619–620.)

The situation here is different from that in *Barrera* and *Fireman's Fund*. Infinity is not attempting to rescind the Infinity policy nor is it attempting to avoid liability under the policy. To the contrary, it has paid the full policy limits of the Infinity policy to plaintiffs. Thus, the duty announced in *Barrera* and *Fireman's Fund* has no application here.

D. *Samson and Related Cases Do Not Support Reforming the Infinity Policy to Provide $750,000 in Coverage*

22.

The trial court ruled that "an insurance company that issues a policy to a motor carrier of property, as defined by the [MCPPA], [is] required to issue a policy with limits of at least $750,000." In so ruling, the trial court stated, "[t]o hold otherwise would allow Infinity to thwart its financial responsibility requirements by writing a policy for less than the statutory minimum requirement. This ruling is consistent with the law and the terms of the subject policy[,]" citing *Samson v. Transamerica Ins. Co.* (1981) 30 Cal.3d 220, 231 (*Samson*), and the provision of the Infinity policy which reads:

> "TERMS OF POLICY CONFORMED TO STATUTES [¶] Terms of this policy which are in conflict with the statutes of the state in which we issue this policy are hereby amended to conform to such statutes." (Unnecessary boldface omitted.)

As discussed *ante*, we reject the premise that an insurer may not issue a motor carrier of property a policy with coverage limits less than the minimum required coverage necessary to obtain a motor carrier permit. As explained, the MCPPA contemplates that a policy with coverage limits less than $750,000 may issue to a motor carrier of property, and relevant DMV regulations expressly allow a motor carrier to stack policies to meet the carrier's financial responsibility requirements. (§ 34631.5, subd. (a)(1); Cal. Code Regs., tit. 13, § 220.06, subd. (a); DMV Form MC 65 M (rev. 12/2012).) Absent certification of greater coverage; or facts suggesting either that Guerra requested such certification or greater coverage and/or that Infinity represented it would provide such certification or greater coverage; or facts suggesting Infinity assumed greater obligations than those provided in the Infinity policy, we conclude reforming the Infinity policy to provide greater coverage is unwarranted and beyond any requirement imposed at law.

The *Samson* case, relied upon by the trial court, does not support the court's determination. In *Samson*, the insured drove his pickup on the wrong side of the road and collided into another vehicle, killing one of its occupants and injuring three others. (*Samson*, *supra*, 30 Cal.3d at p. 224.) The insured was licensed as a "radial highway common carrier" under the Highway Carriers' Act (Pub. Util. Code, former § 3501 et seq.)

23.

but was on a personal errand and not performing services as a common carrier at the time of the accident. (*Samson, supra,* at pp. 225–226.)

The insured carried two insurance policies from separate insurance companies. (*Samson*, *supra*, 30 Cal.3d at pp. 224–225.) His pickup was insured for $100,000 from one company. (*Id*. at p. 224.) His other vehicle, a tractor truck, and two trailers were insured by another company for $300,000. (*Id*. at p. 225.) The latter policy contained an endorsement prepared by the Public Utilities Commission (PUC) which stated it would cover "any final judgment against the insured for bodily injury … 'resulting from the operation, maintenance, or use of motor vehicles for which a … permit is required or has been issued to the insured by the [PUC], regardless of whether such motor vehicles are specifically described in the policy or not.' " (*Ibid*.) The endorsement also stated its purpose was to " 'assure compliance by the insured, as a motor carrier of property, with General Order No. 100-Series' " (*id*. at p. 225, fn. 2), which stated the required total liability limits of a highway carrier's insurance policy for bodily injury or death was $300,000 (*id*. at p. 226, fn. 3) and covered "each vehicle used or to be used in conducting the service performed by … such highway carrier" (*ibid*.).

The insurer that issued the $100,000 policy paid the claimant survivors the policy limits. (*Samson*, *supra*, 30 Cal.3d at p. 228.) The insurer that issued the $300,000 policy denied coverage. (*Id*. at p. 227.) After the survivors obtained a judgment against the insured for $725,000, and an assignment of the insured's claims against the latter insurer, they sued the insurer for the $300,000 policy limit and $325,000 for bad faith refusal to settle. (*Id*. at p. 229.)

The *Samson* court noted the insured's pickup truck had commercial plates and the insured admitted the pickup was used "regularly in his trucking business" although it was not used to actually transport property. (*Samson*, *supra*, 30 Cal.3d at pp. 226, 232.) The court determined the "service performed" by the insured, as that phrase was used in the general order, "include[d] 'every service in connection with or incidental to the

24.

transportation of property ....' " (*Id*. at p. 234.)  The court determined the services provided in the pickup truck were sufficient to bring it within scope of the general order and endorsement and that *"[s]ince both the general order and the endorsement were incorporated into the insurance policy, the ... policy covered [the insured's] pickup truck*." (*Id*. at p. 235, italics added.)

*Samson* bears little similarity to the case before us.  Here, the Infinity policy was not issued for the purpose of complying with the MCPPA and contained no endorsement incorporating MCPPA provisions.  Moreover, the *Samson* court did not reform the insured's policy to provide broader coverage than it actually provided.  Rather, the court determined the policy, as written, *actually* covered all vehicles used in connection with the services performed by the carrier.

Plaintiffs point to language in *Samson* which they contend illustrates that the MCPPA must be incorporated into the Infinity policy, namely:  "Where insurance coverage is required by law, the statutory provisions are incorporated into the insurance contract.  'The obligations of such a policy are measured and defined by the pertinent statute, and the two together form the insurance contract ....  [The] insurance carrier is done no injustice when its rights are determined thereunder.  [¶]  Any provisions of such a policy which are in conflict with the pertinent statutes are nullified and superseded to that extent, particularly where the policy itself, expressly so provides.' " (*Samson*, *supra*, 30 Cal.3d at p. 231.)  However, the Infinity policy did not expressly incorporate, by way of certification, endorsement or otherwise, the statutory provisions of the MCPPA.

Moreover, we reiterate the Infinity policy is not in conflict with the MCPPA with regard to its policy limits because the MCPPA allows a motor carrier of property to meet its financial responsibility requirements by stacking coverage provided by multiple insurance policies.  This means a policy that is intended to support a motor carrier of property's application for a motor permit may, nevertheless, be issued with lower coverage limits than that required by the MCPPA, and the motor carrier may meet MCPPA requirements by

25.

obtaining additional policies of insurance. Thus, the Infinity policy provision which provides that the policy will be conformed statutes in the event of a conflict between the two has no application under the undisputed facts presented.

Plaintiffs also rely on *Empire Fire & Marine Ins. Co. v. Bell* (1997) 55 Cal.App.4th 1410 (*Empire*) to support the trial court's decision to reform the policy limits of the Infinity policy. Plaintiffs' reliance on *Empire* is likewise misplaced.

In *Empire*, the insurance company issued a business automobile policy to an ambulance company. (*Empire*, *supra*, 55 Cal.App.4th at p. 1413.) The county in which the ambulance company operated had adopted an ordinance requiring ambulance services to provide the county with proof of liability insurance and, in accordance therewith, the insurer provided the county with a certificate of insurance as proof its insured met the ordinance's requirements. (*Id*. at pp. 1413, 1423.) The ordinance further required that the policy of insurance must have a "provision requiring 15 days' notice to the county prior to cancellation or modification of the policy." (*Id*. at pp. 1419–1420.) During the policy period, the insurer issued an endorsement to the policy excluding the owner of the company from coverage under the policy without providing DMV the required 15 days' notice. (*Id*. at pp. 1413–1414, 1423.) Two months later, the owner, while operating one of the ambulances, caused an accident and injured a third party. (*Id*. at p. 1415.) The insurer then brought a declaratory relief action to determine whether it had a duty to defend and indemnify the owner. (*Ibid*.) The *Empire* court concluded the insurer was bound by the 15 days' notice period and, having failed to provide such notice to the county that it had excluded the owner from coverage, remained liable on the policy. (*Id*. at p. 1423.)

In summarizing its holding, the *Empire* court wrote, "when, as here, insurance coverage is required by law as a condition to doing business, the provisions of the compulsory insurance law are incorporated into the insurance contract so that *an insurer providing a certificate of insurance* as proof that the regulated business entity has insurance remains liable on its policy until the requisite notice has been given to the regulatory

agency." (*Empire*, *supra*, 55 Cal.App.4th at p. 1415, italics added.) In this regard, *Empire* stands for the unremarkable proposition that, when an insurer certifies to a government agency that it has issued a policy of insurance which complies with an ordinance (or other law), the insurer will be held to provisions of the ordinance (or other law). *Empire* does not aid plaintiffs because, here, Infinity issued no similar certification to comply with the MCPPA.

*Tab* is also unavailing. In *Tab*, the insurer, Transamerica Insurance Company (Transamerica), had issued a policy to a "commercial trucking company regulated by the PUC under the Highway Carriers' Act" (Pub. Util. Code, former § 3501 et seq.), the MCPPA's predecessor statutes. (*Tab*, *supra*, 12 Cal.4th at p. 395.) Transamerica filed a certificate of insurance with the PUC to demonstrate the insured's compliance with the Act and attached the required PUC endorsement to its policy of insurance confirming the policy had been amended to comply with the PUC regulations including General Order No. 100-Series. (*Ibid*.) The certificate stated, "the policy was 'Effective 2-1-80 Until Canceled' " (*Ibid*.) Under the Act, an insurer could cancel a highway carrier insurance policy only upon 30 days' written notice to the PUC (Pub. Util. Code, former § 3634) and this provision was likewise contained in General Order No. 100-Series (*Tab*, at p. 400).

In 1981, the *Tab* insured replaced its Transamerica policy with policies issued by other companies but neither party notified the PUC that the Transamerica policy was canceled. (*Tab*, *supra*, 2 Cal.4th at p. 395.) Eight years later, when the insured was involved in an accident resulting in the death of several third parties, the insured demanded coverage under both its replacement policies as well as the Transamerica policy. (*Ibid*.) Transamerica filed for declaratory relief seeking a determination it was not liable on its policy. (*Id*. at p. 396.) The California Supreme Court held that "because the Transamerica policy was amended by the PUC's standard form endorsement to remain 'in full force and effect until canceled,' it could never lapse by reason of expiration of the policy term" and coverage remained in effect until canceled in the manner required by the PUC regulations.

27.

(*Id*. at p. 401, italics omitted.)  Thus, the Court ruled coverage was still in effect.[15]  (*Id*. at pp. 396, 404.)

In each of the cases discussed above, i.e., *Samson*, *Empire*, and *Tab*, liability was premised on the fact that each of the insurers had actually certified their policies as compliant with the applicable regulatory schemes and/or had amended their policies with endorsements that ensured such compliance.  Here, Infinity did neither.

The parties have not cited to any cases in which a policy has been reformed to meet MCPPA coverage requirements (or that of its predecessor statutes, i.e., the Highway Carriers' Act) absent the insurer providing the applicable certification of insurance and/or policy endorsement and absent facts suggesting the insured had justifiable expectations of greater coverage.  Moreover, we have found none.

---

[15]    The parties, through their counsel of record, notified this court of the existence of new authority—*Allied Premier Ins. v. United Financial Casualty Co.* (July 24, 2023, S267746) __ Cal.5th __ [2023 WL 4696261] (*Allied*)—not available to them at the time of briefing.

In *Allied*, the California Supreme Court considered the following question certified for its review by the United States Court of Appeals for the Ninth Circuit:  "Under [the MCPPA], does a commercial automobile insurance policy continue in full force and effect until the insurer cancels the corresponding Certificate of Insurance on file with the [DMV], regardless of the insurance policy's stated expiration date?"  (*Allied*, *supra*, __ Cal.5th __ [p. 1][2023 WL 4696261])  In response, the *Allied* court wrote:  "The answer is no.  The terms of an insurance contract generally determine the duration of the policy's coverage.  Although an endorsement can amend the policy, neither the [MCPPA] nor the specific endorsement it requires extend coverage beyond the underlying policy's expiration date."  (*Ibid*.)

In answering the certified question, the *Allied* court noted a different result under similar circumstances obtained in *Tab* under the Highway Carriers' Act (Pub. Util. Code, former § 3501 et seq.) but stated the statutory language they relied on in *Tab* was not carried over when that statutory scheme was replaced by the MCPPA.  (*Allied*, *supra*, __ Cal.5th __ [p. 1] [2023 WL 4696261].)  Although the same or similar policy considerations are undoubtedly reflected in the two different statutory schemes, *Allied* confirms that the statutory language matters.

Our opinion in this matter is not affected by the *Allied* decision.  Nothing in that decision is contrary to the holding herein.

## VI. PUBLIC POLICY ARGUMENTS DO NOT WARRANT REFORMATION OF THE INFINITY POLICY

Infinity argues "a rule amending an insurance policy after the fact to include required limits would create perverse incentives for motor carriers to purchase lower limits of liability, knowing that their policies would be deemed to provide higher limits if they were ever in an accident." Plaintiffs contend allowing an insurer to write a policy of insurance to a "known" motor carrier of property for less than the required policy limits under section 34631.5 endangers the public and subverts the MCPPA.

Both policy considerations may be worthy of consideration. However, "[t]he judiciary, in reviewing statutes enacted by the Legislature, may not undertake to evaluate the wisdom of the policies embodied in such legislation; absent a constitutional prohibition, the choice among competing policy considerations in enacting laws is a legislative function." (*Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 53.) Here, the plain language of the MCPPA and DMV regulations do not impose duties on an insurer to provide coverage in the full amount of the minimum policy limits set under section 34631.5 where the insurer does not certify such coverage to the DMV and does not include an endorsement to the insurance policy indicating compliance with MCPPA provisions.

## VII. PLAINTIFFS' AFFIRMATIVE DEFENSES TO THE WRIT PETITION ARE FORFEITED AND/OR WITHOUT MERIT

Plaintiffs have alleged several affirmative defenses to the writ petition, namely the equitable doctrine of laches, the equitable doctrine of waiver, and the equitable doctrine of exhaustion. As for the first two of these defenses, plaintiffs have not provided any legal authority relevant to these doctrines. Consequently, we deem the affirmative defenses forfeited. (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153.)

As for plaintiffs' last affirmative defense of the equitable doctrine of exhaustion, plaintiffs have provided a single citation to *Mitchell v. Superior Court, supra,* 37 Cal.3d 268, without any pinpoint page citation, or discussion of the case and its holding. Plaintiffs contend Infinity has "vastly overstate[d] the scope of the [trial] court's decision" by

29.

contending the subject ruling "amend[s] every policy issued to a motor carrier to include the MCPPA's $750,000 limit" and that Infinity is to blame for the scope of the ruling because it framed the issue for the court's consideration. In its reply, Infinity states it did not file the petition because it considered the subject ruling "overly broad." Rather, it is challenging the legal correctness of the court's ruling. We agree with Infinity and conclude the defense is without merit.

## VIII. THE PROPER RESOLUTION OF ISSUES PRESENTED TO THE TRIAL COURT IN FIRST PHASE OF TRIAL

In light of the discussion above, we conclude the trial court erred by reforming the contract to provide coverage in the amount of $750,000. The stated policy limits in the Infinity policy are not subject to reformation.

### DISPOSITION

The petition is granted. A peremptory writ of mandate shall issue directing respondent court to vacate its "RULINGS AFTER COURT TRIAL" (i.e., the subject ruling) entered on August 3, 2022. On remand, respondent court shall enter a new ruling consistent with the views expressed herein and declaring the Infinity policy limit is $50,000.

Petitioners Infinity Select Insurance Company and Infinity Property and Casualty Corporation are entitled to their costs under California Rules of Court, rule 8.493(a)(1)(A).

FRANSON, J.

WE CONCUR:

LEVY, Acting P. J.

SMITH, J.

30.